12976

STATE v. RECTOR *ET AL.*

(155 S. E., 385)

March, 1930.

*Messrs. J. G. Leatherwood, Solicitor,* and *C. Granville Wyche,* for appellant,

*Messrs. D. W. Smoak, J. D. Lanford, W. D. Workman, J. Frank Epps, Claude N. Sapp* and *Mendel L. Smith,* for respondent,

September 19, 1930.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

On motion of the defendants, Rector and Moore, the indictment in this case was quashed, and, from the order to that effect, the State has appealed.

The indictment contained three counts, all revolving around the alleged murder of Sam D. Willis. In the first, it was sought to charge the defendants, Rector, Moore, and Blair Rooks, as principals, with murder; in the second, Blair Rooks, as principal, and Rector and Moore as accessories before the fact; and, in the third, to charge Rooks, as principal, and the other defendants as accessories after the fact.

The first ground on which the order of the circuit Judge was based was because, in his opinion, the indictment failed to allege, in either of the counts, the place of the death of the deceased, Willis; and that matter we shall first consider.

Our General Assembly has sought to simplify indictments in criminal cases, and to do away with much of the useless phraseology known to those instruments of pleading under the rules of common law. See Sections 89 and 93 of the Code of Criminal Procedure 1922, and *State v. Alexander*, 140 S. C., 325, 138 S. E., 835. But those statutory enactments must be construed as to harmonize them with the provision of Section 18, Article 1 of our Constitution, which declares, "In all criminal prosecutions the accused shall * * * be fully informed of the nature and cause of the accusation." *State v. Jeffcoat*, 54 S. C., 196, 32 S. E., 298.

The crime of murder is a composite one. It includes the assault committed upon a person with intent to kill, and the resulting death from that assault. The assault alone does not constitute the crime. Neither does the death of the person of itself make the crime. The crime cannot become complete until after the death of the assaulted person has occurred. The State must prove not only the assault and the death occurring from it, but the time of the assault and the time of the death, as time is recognized in the law. In addition, the State must prove the place of the assault and the place of death. These necessary elements of the crime of murder must not only be proved, before a person accused may be lawfully cnvicted, but they must be alleged in the indictment returned against the accused by the grand jury. The provisions of the Constitution, recognizing and following the principles of the common law, require the indictment to contain allegations to those effects. The provisions of the Criminal Code of Procedure, Section 93, recognize that indictments for murder shall comply with the constitutional requirements, for in that section it is stated that an indictment for that crime shall set forth "the time

and place" of the murder alleged to have been committed. See the recent case of *State v. Platt,* 154 S. C., 1, 151 S. E., 206, where we went fully into the necessity of alleging and proving the place of death of the person alleged to have been murdered.

The law being so plain, it is only uecessary for us to inquire if the indictment in this case contained an allegation as to the place of the death of the deceased. In construing the effect of any one count in an indictment, we are required to look to the words of such count alone, for resort cannot be had to any other count to supply any deficiency in the count under consideration, or to explain the intention of that count. *State v. Banks,* 84 S. C., 543, 66 S. E., 999. In determining the intention and effect of any one count, however, we must look to all the words contained therein, in whatever paragraph they may be found, or whatever position they may occupy.

The language of each count of the indictment which in any way refers to the place of death is exactly the same. So it is only necessary to examine and pass upon the language of the first count in the consideration of the whole indictment, and our holding as to that count will control as to the other two counts.

The first count, quoted in full, was as follows:

"The grand jurors of and for the county aforesaid, in the State aforesaid, upon their oath, present that Carlos A. Rector, J. Harmon Moore and Blair Rooks, on the twelfth day of June, in the year of our Lord one thousand nine hundred twenty-seven, with force and arms at Greenville, in the County of Greenville, State of South Carolina, in and upon one Sam D. Willis, feloniously, willfully and of their malice aforethought, did make an assault; and that the said Carlos A. Rector, J. Harmon Moore and Blair Rooks, him, the said Sam D. Willis, then and there feloniously, willfully, and of their malice aforethought, with a pistol did shoot and wound; giving to the said Sam D. Willis thereby in and upon

the body of him, the said Sam D. Willis, one mortal wound; of which said mortal wound the said Sam D. Willis did then die.

"And so the jurors aforesaid, upon their oath aforesaid, do say that the said Carlos A. Rector, J. Harmon Moore and Blair Rooks, him the said Sam D. Willis then and there in the manner aid by the means aforesaid, feloniously, willfully and of their malice aforethought, did kill and murder against the form of the statute in such case made and provided, and against the peace and dignity of the State."

In the first paragraph where the words "did then die" are used, it has been the practice to state "did then and there die," where the death of the deceased occurred in the same county where the assault was alleged to have been committed. If the death occurred at a place other than where the assault was alleged to have taken place, the practice has been to allege specifically the place of death; that is, the county and the state where the death of the deceased occurred. The indictment here, therefore, did not contain the language usually set forth in indictments for murder, since the passage of the statutes simplifying indictments for crime. And the failure to follow the customary manner of alleging necessary facts in an indictment for murder has brought about the question raised by the defendants in their motion to quash.

That we may examine the language of the count more closely, let us remove therefrom much of its phraseology and look mainly to the words italicised by us, which give, we think, information as to the time and place of the alleged assault and *the time and place* of the death of the deceased. The count then would read as follows:

"* * * Carlos A. Rector, J. Harmon Moore and Blair Rooks, *on the twelfth day of June,* in the year of our Lord one thousand nine hundred twenty-seven * * * *at Greenville, in the County of Greenville,* * * * in and upon one Sam D. Willis, * * * *did make an as-*

*sault;* and that the said Carlos A. Rector, J. Harmon Moore and Blair Rooks, him the said Sam D. Willis, *then and there* \* \* \* *did shoot and wound;* giving to the said Sam D. Willis \* \* \* *one mortal wound;* of which said mortal wound the said Sam D. Willis *did then die.*

"\* \* \* That the said Carlos A. Rector, J. Harmon Moore and Blair Rooks, him the said Sam D. Willis *then and there* \* \* \* *did kill and murder.* \* \* \*"

It is clear that the count charged the assault to have been made on June 12, 1927, in the county of Greenville. It is equally clear that it charged that the accused *then and there,* that is, on June 12, 1927, and *in Greenville county, did shoot and wound* Willis. The wound given Willis was alleged to have been *one mortal wound,* and of that mortal wound it was charged that Willis *did then die.* The date of his death, by the use of the expression "did then die," clearly referred back to June 12, 1927, the only date named in the indictment, on which date it had been formerly stated the assault occurred and the mortal wound was given. Reference to the second paragraph of the count will disclose that therein it was stated that the defendants *"then and there* \* \* \* *did kill and murder.* \* \* \*" The murder there alleged to have been committed was the *assault* of Willis and *his death* from that assault. The word "then," used in that connection, clearly referred back to the time the assault was alleged to have been made, the time the wound was given, and the time Willis was alleged to have died, namely, June 12, 1927, for that was the only day mentioned in the count. The word "there" referred back to the place where the assault was made, the place where the wound was given, and the *place where Willis died,* for the only place mentioned in the indictment, prior to the appearance of the words "then and there," was *Greenville, in the county of Greenville.* We must hold that the use of the words "then and there," in the connection they were used, were sufficient

to show that the *place of death* of the deceased was alleged to have been *in the county of Greenville.*

Our conclusion is supported by the decision of this Court in the case of the *State v. Blakeney,* 33 S. C., 111, 11 S. E., 637. In that case the words "soon thereafter died" were used, where the indictment here had the words "did then die." On the trial of Blakeney, the point was made that the place of the death of the deceased had not been alleged. The Circuit Judge agreed with that view and allowed the solicitor to amend the indictment. After conviction, Blakeney appealed to the Supreme Court because of the rulings of the presiding Judge on the indictment. This Court held that the lower Court committed error in allowing the amendment. But the conviction was affirmed on the ground that the amendment was not necessary, since by the use of the words "then and there" in the indictment, just as they were used in the indictment in the case at bar, there was a sufficient allegation that the death of the deceased had occurred at the same place where the assault was alleged to have been committed. The case of *State v. Platt, supra,* not only approves the holding of the *Blakeney case,* but tends also to support the sufficiency of the indictment in this case as to the attack for failure to allege the place of death. In the *Platt case,* we held that the words "then and there died," used in the first paragraph of the count where only the words "did then die" were used in this indictment, showed not only that the assault alleged in the Platt indictment occurred in Marion county, but that the death of the deceased was also alleged to have occurred in that county. The difference between this case and the *Platt case* is that the words "then and there" were used here in the second paragraph, while in the *Platt case* they were used in the first paragraph of the count. In the Platt indictment, prior to the use of the words "then and there," the only place mentioned was Marion county, so we concluded the place of death was alleged to have been Marion county. In this case, the only place mentioned, prior to the use of the words "then

and there," was Greenville county, and those words must have referred to that particular place.

The other ground for quashing the indictment related to the ineligibility of certain grand jurors who passed upon it. It is conceded that of the full panel of eighteen jurors, one had been excused from attendance upon the Court, and at least two of the seventeen in attendance were not registered electors of the county, either when they were drawn for service or when they acted on the bill.

Section 22 of article 5 of the Constitution is as follows:

"All persons charged with offence shall have the right to demand and obtain a trial by jury. The jury in cases civil or criminal in all Municipal Courts inferior to Circuit Courts shall consist of six. The grand jury of each county shall consist of eighteen members, twelve of whom must agree in a matter before it can be submitted to the Court.

"Petit Jury.—The petit jury of the Circuit Courts shall consist of twelve men, all of whom must agree to a verdict in order to render the same.

"Qualification of Jurors.—Each juror must be a qualified elector under the provisions of this Constitution, between the ages of twenty-one and sixty-five years and of good moral character."

It is undisputed since the decision of this Court in ▄▄ *Mew v. Charleston & Savannah Railway Co.*, 55 S. C., 90, 32 S. E., 828, decided in 1899, that the term "qualified elector," in the Constitution, means a "registered elector"; and that a juror, grand as well as petit, must be a registered elector of the county in which he is called to serve. The holdings mentioned in that case have been repeatedly approved by this Court. See *State v. Rafe*, 56 S. C., 379, 34 S. E., 660; *State v. Brownfield*, 60 S. C., 509, 39 S. E., 2; *State v. Mittle*, 120 S. C., 526, 113 S. E., 335.

The counsel for the appellant contend, however, that the indictment here was valid, since there was on the grand jury, when the same was considered and concurred in, at

least twelve competent grand jurors. The argument is that so long as twelve grand jurors, competent to act as such, participated in the finding of a true bill, the indictment is good, even if one or more disqualified grand jurors took part in the finding. To support this position, four cases, previously determined by this Court, are cited; and, upon examination, it seems that some, if not all, of them appear to do so. The last decided case to which we have been cited is *State v. Bazen,* 89 S. C., 260, 71 S. E., 779. In the lower Court, the defendant sought unsuccessfully to have an indictment quashed because of the alleged disqualification of one grand juror, on account of his being above the age of sixty-five years. On appeal of this Court, his contention was denied, as stated in the opinion, for two reasons: First, because there was nothing in the record showing proof of the alleged disqualification; and, second, because the disqualification of a single grand juror will not invalidate an indictment, unless it appears the grand jury was composed of only twelve men. The first ground was of course, entirely sufficient upon which to rest an affirmance of the ruling of the lower Court, for the presumption always obtains that one, acting in the capacity of a grand juror, is qualified to do so, until proof to the contrary appears. While it was necessary for the Court to announce the second ground, upon which it rested its conclusion, we are faced with the fact that it made the declaration mentioned, although there was a vigorous dissent to the proposition on the part of Associate Justice Hydrick. To sustain the second holding, the Court pointed to the cases of *State v. Rafe,* 56 S. C., 379, 34 S. E., 660, 661, and *State v. Graham,* 79 S. C., 116, 60 S. E., 431, 432, both of which have been cited by the appellant.

In *Graham's case,* the defendant moved to quash the indictment because one of the grand jurors, who participated in finding it, was a magistrate, and his motion was refused. Under the law at that time, as it is now (Section 567, Code of Civil Procedure 1922), a magistrate was ineligible "as a

juryman in any civil or criminal case." That case supports more strongly than any other the position of the appellant. The defendant therein did not wait too long to raise the question as to the disqualification of the grand juror. While this Court held that the magistrate was disqualified to act as a grand juror, the appeal was not sustained, for the reason, as the Court stated: "The defendant did not show that he was prejudiced by the fact of the grand juror's disqualification, or that Counts [the grand juror] had had any connection with the case in his capacity as magistrate." In connection with the conclusion reached, certain language from the case of the *State v. Rafe, supra,* was quoted, which we also quote hereinafter. (It is perhaps not out of place for the writer to say that he was not attorney for the defendant in the *Graham case;* the report might indicate that he was.)

Because the decisions in the *Bazen* and *Graham cases* went back to the case of *State v. Rafe* for their support, it is necessary to pay considerable attention to the opinion there rendered. That case, in our humble opinion, unfortunately, has brought about the confusion in the law on the subject. After Rafe's conviction, for the first time, his counsel made objection that a member of the grand jury that found the bill was not a registered, qualified elector, and, on that ground, a new trial was moved. On refusal to grant that motion, the question involved came to this Court. Very properly, we think, the action of the lower Court was affirmed, because as this Court held, the defendant could have ascertained, before he was put to trial, the fact that the grand juror was not a registered elector. In other words, as held in *State v. Boyd,* 56 S. C., 382, 34 S. E., 661 (the first reported case after the *Rafe case*), and in many other cases, a motion to quash an indictment on the ground of disqualification of a grand juror comes too late after the defendant has pleaded to the indictment. In disposing of the only question in the *Rafe case,* the Court concluded its remarks thereon with this statement:

"It was necessary for the appellant to show, not only that he did not know of the juror's disqualification until after the trial, but that by the use of due diligence he could not have discovered the same. This he has failed to do."

Following what we have quoted, it said other things not necessary to a determination of the question for decision, and the language there used is that which has been quoted and referred to in the later cases as authority for the conclusions reached. It was this:

"But, even if he had shown these facts, it would be necessary for him to present such a state of facts as would lead the Court to believe that he had been prejudiced by the fact that the juror was disqualified. *For instance, if it appeared in the record that every juror on the panel was disqualified, or that the true bill was found by a grand jury composed of only twelve men, one of whom was disqualified, the Court would necessarily conclude that the bill was not found by a legal grand jury. There are no facts set out in the record showing that the appellant was prejudiced by the disqualification of the juror,* and the appeal must be dismissed." (Italics added).

The language emphasized, as will be seen by reference to the other cases to which we have adverted, we think has been misunderstood. It was thought to have expressly decided that *so long as a grand jury, when considering a bill, is composed of at least twelve qualified members, an indictment returned by it is valid, even if one or more disqualified jurors participated; and, accordingly, a motion to quash on the ground of a disqualified grand juror acting would not lie.* We do not think the language of the Court had the effect given to it, and we doubt exceedingly if it was intended to so have. The reporter of the Court at that time, Honorable C. M. Efird, a lawyer of much ability and experience, evidently did not so understand the language, for his two syllabi, referring to what the Court had decided, were as follows:

"A new trial will not be granted on motion after verdict, because a member of the grand jury finding the bill was not a registered elector, because he could have ascertained that fact before trial.

"Before·new trial will be granted on ground of disquali-fication of grand juror, appellant must show that he has been prejudiced by that fact."

The writers of headnotes for the *Southeastern Reporter* also must have construed the decision of the Court other-wise, for their syllabi on the case were these:

"A motion in arrest of judgment, made by one who has been convicted of murder, on the ground that one of the members of the grand jury who returned the indictment was not a qualified elector, is properly denied, though defendant did not know such fact until after the trial, where it could have been discovered by the exercise of ordinary diligence.

"A defendant is not entitled to a motion in arrest of judgment on the ground that a member of the grand jury which returned the indictment was disqualified, in the ab-sence of a showing of prejudice."

It is to be always remembered that the *Rafe case* did not in any way concern a motion to quash an indictment. It related solely to a motion for an arrest of judgment and a new trial. All we have quoted from the opinion, taken in connection with everything said therein, and the facts of the case, applied to the one question involved, convince us, and the syllabi of the digesters support the conclusion, that the Court held, and intended to hold, briefly stated, the follow-ing: A motion for a new trial, after conviction, on the sole ground that a member of the grand jury returning the in-dictment was not a qualified elector, will be denied, though the defendant did not know of the disqualification earlier, for by the exercise of ordinary diligence the fact of the disqualification could have been discovered before trial. While the Court did not directly so decide, the point not being involved, it did indicate that a new trial might be

granted if the defendant showed that he was prejudiced because a grand juror returning the indictment was disqualified, "if it appeared in the record that every juror on the panel was disqualified, or that the true bill was found by a grand jury composed of only twelve men, one of whom was disqualified," for it was said from either of those sets of facts, "the Court would necessarily conclude that the bill was not found by a legal grand jury."

We are unable after a most careful study of all the language of the opinion in the *Rafe case* to find therein any words which show that the Court held, or intended to hold, that an indictment should not be quashed because of the disqualification of a grand juror who participated in the finding, when it appeared that as many as twelve competent grand jurors may have concurred in the finding. It follows that the apparent approval of that position in the succeeding cases of *State v. Graham* and *State v. Bazen* was based upon a former holding supposed to have been made, but which, in our opinion, had not been declared. As indicated before, however, the *Graham case* by itself, without reference to any other case, supports that holding. It is our opinion, though, that the holding to that effect, found in the *Graham case,* was not sustained by authority, it was not in harmony with older cases in this State, it was against the general rule on the subject, it conflicted with other decisions of this Court made about the same time, it has been weakened considerably by declarations in more recent cases, and, as we think, it was opposed to sound reasoning—all of which we shall endeavor to demonstrate.

As long as the grand jury has been known to our judicial system, and that body came with the organization of our first Courts, their acts and proceedings have been regarded almost sacredly secret. The oath that each and every member of the grand jury has taken in open Court in South Carolina for many years includes the swearing on his part that "the State's counsel, your fellows, and your own, you

shall well and truly keep secret." Miller's compilation, published in 1848; Earle's South Carolina Form Book, 336, published in 1911.

In 1834, the Court of last resort said: "The nature of the grand juror's oath sufficiently indicates that they are not to communicate to others that which passes among the jurymen in their consultation, and I think the juror who made the affidavit in the present instance was guilty of a violation of duty." *State v. Boyd,* 2 Hill (20 S. C. L.), 288, 27 Am. Dec., 376.

The quashing of an indictment in a murder case in 1870 was approved by the Supreme Court, when it appeared that an attorney, employed to assist a solicitor in the prosecution of the case, had entered the room of the grand jury, when they were deliberating on a bill, and advised them in reference to their duty. *State v. Addison,* 2 S. C., 356.

In *State v. McNinch,* 12 S. C., 89, this Court, while holding that the solicitor of the circuit, at the request of the foreman of the grand jury, might direct him how to write the findings of that body, indicated that not even that sworn high officer of the Court, and recognized adviser of the grand jury, should be in the room while the case of a prisoner was under consideration.

The rule, generally, throughout all jurisdictions in the United States, is well expressed by the writer of the article on the "Grand Jury" in Ruling Case Law, as follows:

"It has long been the policy of the law, in furtherance of justice, that the investigation and deliberations of a grand jury should be conducted in secret, and that for most intents and purposes all its proceedings are legally sealed against divulgence. The grand jurors are sworn to keep secret the state's, their fellows' and their own counsel. * * * And apparently aside from the violation of any oath, it has been declared that the disclosure of the proceedings before the grand jury in a certain state of the case might render a grand juror liable to a criminal charge as an accessory after

the fact. So it seems that the duty of secrecy is not founded primarily on the oath of the juror, but on deep-seated principles of public policy of which the common form of oath is merely an expression." 12 R. C. L., 1,037. In line with these principles, see also 20 Cyc., 1351; 28 C. J., 812.

From the pronouncements of the given authorities, it is plain that the general rule observed in all jurisdictions to which there is no exception, except where made by proper legislation, forbids any inquiry into the proceedings of the grand jury. Our decisions show that our Courts have adhered strictly to that rule. No one, not even the presiding Judge, may invade the secrecy of the grand jury's deliberations, to inquire what influences moved them in their acts, or to ascertain how any member may have voted. So, the trial Judge in this case was clearly right when he ruled that he could take no step looking to the obtaining of information as to the number of grand jurors concurring in the indictment, and if the necessary number, who did concur included one or more of the members who were not registered electors.

The grand jury, at their organization in the Court, is instructed properly by the Judge presiding therein that, to return a "True bill" against one for crime, at least twelve of the grand jurors must concur in the finding, as required by our Constitution, and if less than twelve agree thereto, the indictment must be returned "No bill." Because the law allows twelve of the grand jury to make a presentment or to return an indictment, it has been long the practice, and a correct one, as we shall later show, for our Circuit Judges to hold that the grand jury can act legally with less than eighteen of its members in attendance, so long as at least twelve participate; the requirement that twelve concur in the finding, of course, being observed. Under that practice, grand jurors are given much liberty by the Court, and are often permitted to come and go at their own will, with the consent of their foreman. Care has been taken, however, by the

Courts, and the grand jury as well, as it should be, to see that at least twelve of the body are in attendance when matters are being deliberated and when it comes into Court to announce a presentment or indictment.

Without question, as indicated in *State v. Rafe,* "if it appeared in the record" of the Court "that every juror on the panel was disqualified, or that the true bill was found by a grand jury composed of only twelve men, one of whom was disqualified," the Court would necessarily conclude that the bill was not found by a legal grand jury." Under the holding in the *Graham case* that the defendant must "show that he was prejudiced by the fact of the grand juror's disqualification," he could show the necessary prejudice referred to by one or other of the state of facts spoken of in the *Rafe case.*

We can hardly conceive, however, how one accused could make the required showing of prejudice, as laid down in the *Graham case,* when the facts were other or different from those supposed in the *Rafe case,* as has been well illustrated by the facts in this case. Since it is the law that as many as twelve grand jurors, but no more, have to take part in the consideration of an indictment and concur in finding a true bill thereon, and with no power known to our jurisprudence whereby the Court can inquire as to the vote of any individual grand juror, in a case where more than twelve have acted, with one or more of them disqualified, how may the defendant "show that he was prejudiced by the fact" that a person disqualified to act as a grand juror participated in finding the indictment against him? To require him to do so, as it was held in the *Graham case* he should do, is to demand an impossibility. It is to tell him that he must establish something, even if it be true, that he is powerless to have disclosed.

In Section 17, Article 1, of the Constitution, it is declared: "No person shall be held to answer for any crime where the punishment exceeds a fine of one hundred dollars or imprisonment for thirty days, with or without hard labor,

unless on a presentment or indictment of a grand jury of the county where the crime shall have been committed, except in cases arising in the land or naval forces or in the militia when in actual service in time of war or public danger."

In seeking the true meaning of any section of our ▮▮▮ Constitution, or any of the language thereof, it is proper for any other section or language of the Constitution, which may in any wise pertain to the subject under consideration, to be examined. *Powell v. Hargrove,* 136 S. C., 345, 134 S. E., 380. The indictment to be preferred by a grand jury, as required in the section of the Constitution last mentioned, must of course, be one which has been returned by a legal grand jury. Section 17 or Article 1, therefore, must be considered in connection with Section 22 of Article 5, quoted earlier herein, for in that section the persons who are to compose a legal grand jury are therein described, and a legal grand juror, under the terms of the Constitution, must be a qualified elector. While the disqualification of a grand juror may be waived by the defendant if he does not make the objection in time *(State v. Motley,* 7 Rich., [41 S. C. L.], 327, and *State v. Boyd,* 56 S. C., 382, 34 S. E., 661), yet when a defendant does insist at the time when he may do so, he is entitled, as a matter of constitutional right, to have the grand jury, which indicts him, composed only of such persons as the Constitution of the State has plainly declared may act thereon.

The provision of our Constitution that only a qualified ▮▮▮ elector may be a member of the grand jury is, in our opinion, mandatory, for in Section 29, Article 1, of that instrument, it is expressly declared: "The provisions of the Constitution shall be taken, deemed and construed to be mandatory and prohibitory, and not merely directory, except where expressly made directory or permissory by its own terms." We are sustained in this view by the expression to that effect on the part of the great jurist, Chief Jus-

230

tice McIver. *State v. Powers,* 59 S. C., 200, 37 S. E., 690. The provision in Article 5, § 22, that the petit jury in the Circuit Courts shall consist of twelve men, has been held absolutely mandatory as to criminal cases, and this Court went so far as to say that a defendant who had not expressly consented to a trial by eleven men, even if he had not objected, and although his attorney·consented, could afterward raise the question that he had not been convicted of crime according to the Constitution of this State, and, upon his demand therefor, be tried again before he could be made to undergo punishment. *State v. Hall,* 137 S. C., 261, 101 S. E., 662.

We are inclined to think also that one who demands and is refused the right to be tried for crime charged against him only upon an indictment presented by a legal grand jury, in instances where such indictment is required, may thereafter justly take the position that he has been "deprived of life, liberty or property without due process of law," in violation of the provisions of Section 5 of Article 1 of the Constitution, where the people of this State have made "Declaration of Rights."

In passing upon questions relating to the right of jury trial, which great right "shall be preserved inviolate," as the people of our State have said in (Article 1, § 25 of the Constitution), including the. right to demand before that trial shall be begun, the other right to be indicted by a legal grand jury, Sir William Blackstone, tracing the history of jury trial, which has·come down to us from our English forefathers, has used certain language which we think we should be constantly reminded of. This was said by the great commentator:

"But the founders of the English law have, with excellent forecast, contrived that no man shall be called to answer to the King for any capital crime, unless upon the preparatory accusation of twelve or more of his fellow-subjects, the grand jury; and that the truth of every accusation,

\* \* \* should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbors, indifferently chosen and superior to all suspicion. So that the liberties of England cannot but subsist so long as the palladium \* \* \* remains sacred and inviolate; not only from all open attacks \* \* \* but also from all secret machinations, which may sap and undermine it; by introducing new and arbitrary methods of trial, by justices of the peace, commissioners of the revenue, and Courts of Conscience. And however convenient these may appear at first (as doubtless all arbitrary powers, well executed, are the most convenient), yet let it be again remembered, that delays and little inconveniences in the forms of justice, are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our Constitution; and that though begun in trifles, the precedent may gradually increase and spread, to the utter disuse of juries in questions of the most momentous concern." Cooley's Blackstone (4th Ed.), Book IV, 350.

In speaking of the qualifications of members of the grand jury in his day, Blackstone said: "They ought to be freeholders. \* \* \* However, they are usually gentlemen of the best figure in the county." At that time, the ownership of land, knighthood, and chivalry had much to do with the standing of a man in his community. The people then did not have the right of suffrage now given to us. There was no requirement that a grand juror must be a qualified elector. The number of grand jurors, according to Mr. Blackstone, were not to be less than twelve nor to exceed twenty-three.

From time to time there were changes as to the qualifications of jurors. Under the Act of our Legislature of 1799, it was unnecessary for a juror to be a freeholder, but it was required that he show that he had paid in the preceding year a tax of at least three shillings. *State v. Massey, 2*

Hill (20 S. C. L.), 379. In that case, objection was made to a juror on the ground that he was not a freeholder. On account of the change in the law, Judge O'Neall, who spoke for the Court, held that the objection was not well taken, but indicated, however, that if the juror had not paid the tax required, it would have been good cause to challenge him.

In *State v. Blackledge*, 7 Rich. (41 S. C. L.), 327, decided in 1854, the prisoner, after his conviction and sentence to death, in an attempt to arrest the judgment, raised the question that one of the grand jurors was disqualified. The Court of Appeals said his objection came too late, but intimated that if it had been presented in time, the prisoner's complaint would have been just. The Court used this language:

"It must be conceded, however, as a part of our fundamental law, that 'no man's life can be taken away by judicial proceeding, but by the judgment, on oath, of twenty-four men, at the least'; a grand jury must accuse, twelve at least of whom must concur in finding the bill of indictment; a petit jury, consisting of twelve, must concur in finding the truth of the fact of which the prisoner is accused, before a verdict of guilty can be rendered. These, with other protections which are thrown around the prisoner by the law, must be held inviolate. So, too, it is to be conceded that grand, as well as petit jurors, ought to be *probi et legales homines* [*'persons competent in point of law to serve on juries'*]. Well-founded objections impugning these essential safeguards, are entitled to, and must receive just consideration, when presented at the proper time." (Italics added.)

*In State v. Clayton*, 11 Rich. (44 S. C. L.), 581, decided in 1858, the Court considered the matter of the grand jury consisting of only thirteen members when the true bill was found and returned. It was held that under the common law on the subject, a grand jury could consist of not less than twelve and not more than twenty-three. But, said the Court, speaking upon the authority of the older law writers: "An

indictment is an accusation, 'found by a proper jury of twelve men,' meaning by 'proper,' no doubt, *men of the proper quali-fications,* and resident in the county or other prescribed jurisdiction of the Court. But a jury of twelve men is recognized as a complete one." (Italics added.)

As to the number of the members who shall compose the grand jury, the appellant has cited *State v. Williams,* 35 S. C., 344, 14 S. E., 819, 820, decided in 1892, when the Constitution of 1868 was of force. There is no doubt that the Court there decided, as the appellant contends, and with that position we are in full accord, that the grand jury need not have more than twelve of its members present when a bill of indictment is. found. That case does not positively hold with our view that the members of the grand jury, who consider the bill of indictment, however, must be qualified, according to the Constitution, but we regard what was there said as, at least, pointing that way. The defendant there sought to quash the indictment on the ground that the grand jury was illegal, in that several of the grand jurors were not qualified to serve. It was insisted that the members of the grand jury must be freeholders, and that many of them were not; and other grounds of objection to individual members were raised. The requirements of the present Constitution as to the qualification of jurors were not contained in the Constiution of 1868. The qualifications of jurors then were fixed only by statute, and these statutes, it seems, were regarded more as directory than mandatory. The Court said: "The requirements of the law are fully met when good and true men are called to serve upon the juries of our country, without any regard being paid to the amount of rent rolls on the one side, or of bank accounts on the other."

In considering cases decided under the Constitution of 1868, we must not forget that the framers of that instrument were particularly interested in providing that all persons, even if they had lived in South Carolina but a little while, should have the right to serve on juries, and as expressed in

one of the statutes relating to jury service, "without distinction of race or color or former condition." The convention which adopted that Constitution purposely left the qualification of jurors for legislative action. In any event, the *Williams case* does not have in it anything which would warrant a holding in conflict with our present constitutional requirement as to the eligibility of jurors.

The case of *State v. Berkeley,* 64 S. C., 194, 41 S. E., 961, while not cited by the appellant, in some respects, seems to be in line with its position. Under our examination, it is the first case citing *State v. Rafe, supra,* and we are disposed to think that the Court, in its opinion, there fell into the same error as to the meaning of the language in the *Rafe case,* into which the Court fell in the *Graham* and *Bazen cases.* The defendant there asked for a new trial because one of the grand jurors was disqualified. The Court for two reasons, first, because no objection had been made before pleading to the indictment, and second, because prejudice by the presence of the disqualified grand juror had not been shown, refused to sustain the appeal. As we have before endeavored to show, the first ground was correct and entirely sufficient upon which to rest the decision of the case. The second ground, however, as we view it, was not necessary, and it was erroneous.

Certain language of that learned jurist, Justice Woods, who spoke for the Court in the *Graham case,* when he wrote the opinion in *State v. Smalls,* 73 S. C., 516, 53 S. E., 976, 977, which was decided after the *Rafe case,* and a short while before the *Graham case,* we regard, in view of the facts upon which the opinion was based, especially inconsistent with the principles of the *Graham case.* The defendants were convicted of murder and appealed. They charged certain irregularities in the drawing of the grand jurors, which objection they did not raise, however, until after conviction. The Court held that the statutes, as to the manner of selecting jurors were usually regarded as directory only, that there

was no evidence that the appellants had been injured by the irregularities, and that the objections made by them came too late, since it was not shown that the irregularities were not known before trial. In concluding his opinion, Mr. Justice Woods used this language:

"We do not think the method of drawing the jury was, as defendant's counsel contends, more than an irregularity and such a fatal defect as to leave the Court without jurisdiction to try the defendants. There is no allegation or proof that those who composed the juries were not *probi et legales homines,* that is, good and lawful men competent to act as jurors, and statutes which prescribe the time and manner of selecting jurors are usually regarded as directory."

To sustain what we have quoted from the opinion, there were cited the following cases: *State v. Johnson,* 66 S. C., 23, 44 S. E., 58; *Rhodes v. Southern Ry. Co.,* 68 S. C., 494, 47 S. E., 689, which we have not referred to, and the *Massey (or Baldwin), Blackledge, Clayton, Boyd, and Berkeley cases,* which we have heretofore mentioned. With the exception of the *Rhodes case,* every one of the cited cases related to questions as to jurors raised by the defendants after conviction. Not one of them touched the question of the qualification of a juror raised on motion to quash the indictment. The *Rhodes case* was a civil action, and the question there concerned the quashing of the whole array of petit jurors, because of alleged irregularities in preparing the jury box. The Court held that the irregularities were not sufficient on which to base the motion. It is right significant, we think, in view of the many cases cited, that *State v. Rafe,* decided just a few years previously, was not in the list. Did Mr. Justice Woods intend to imply that even after conviction, if the defendants could have shown that they had been indicted by grand jurors not competent to act as jurors," that the appeal would have been sustained? We doubt this very much, for the cases cited by him show that, generally, objections to grand jurors after rendition of verdict, come too

late. What then, was meant? We are inclined to the opinion it was that if the objections could be sustained by proof, and had been advanced at the proper time, they, in all likelihood, would have resulted in reversing the judgment.

Turning away from our own decisions for a little, we look at the interesting case of *Crowley v. United States,* 194 U. S., 461, 24 S. Ct., 731, 736, 48 L. Ed., 1075. The Federal Supreme Court quoted with approval from the case of *Vanhook v. State,* 12 Tex., 252, the following:

"The better opinion, to be deduced from the authorities to which we have access, seems to be that irregularities in selecting and impaneling a grand jury, which do not relate to the competency of individual jurors, can, in general, only be objected to by a challenge to the array, but that the incompetency, or want of the requisite qualifications of the jurors, may be pleaded in abatement to the indictment. And this doctrine and distinction seems founded on principle. It is the right of the accused to have the question of his guilt decided by two competent juries before he is condemned to punishment. It is his right, in the first place, to have the accusation passed upon before he can be called upon to answer to the charge of crime, by a grand jury composed of good and lawful men. If the jury be not composed of such men as possess the requisite qualifications, he ought not to be put upon his trial upon a charge preferred by them, but should be permitted to plead their incompetency to prefer the charge and put him upon his trial, in avoidance of the indictment. Otherwise he may be compelled to answer to a criminal charge preferred by men who are infamous, or unworthy to be his accusers."

After determining that several of the grand jurors who were not qualified to serve had participated in the finding of the indictment, and that the defendant had moved in time to protect his rights, Mr. Justice Harlan, who spoke for the Court, concluded his opinion with this statement:

"For the reasons stated, * * * we adjudge only that the presence on the grand jury of persons summoned after

the local statute took effect, and who were disqualified by that statute—those facts having been seasonably brought to the attention of the Court by a plea in abatement filed before arraignment—vitiated the indictment."

Upon the authority of many cases cited from the Courts of the United States, and eighteen states of the Union, this general principle has been stated:

"It is well settled that the incompetency or want of the requisite qualifications of one or more grand jurors may be set up as an objection to an indictment found by a grand jury of which such grand jurors were members, however many unexceptionable persons may have concurred in finding such indictment." 17 A. & E. Encyclopedia of Law (2d Ed.), 1268.

In Corpus Juris we find, pertaining to the subject, the following:

"There is no harmony between the decisions as to whether the disqualification of an individual grand juror is ground for a motion to quash or set aside the indictment. *It is so regarded in some jurisdictions, especially where defendants have had no opportunity to challenge,* decisions to this effect being sometimes based on express statutes. *The rule is subject to the limitation that the disqualified juror shall have taken part in the consideration of the charge against defendant, or the deliberations of the grand jury therein.* In other jurisdictions a contrary rule prevails, frequently by reason of express statutory provision. * * * 'And it is held that the disqualification of a single grand juror does not invalidate an indictment, unless the grand jury was composed of only twelve men." (Emphasis added.) 31 C. J., 806.

Under that authority, in jurisdictions where defendants have had no opportunity to challenge, the indictment may be quashed because of the disqualification of an individual juror. It is true that in our State our Circuit Judges, when they know of any good reason why a grand juror should

not participate in the consideration of an indictment, very propery direct him to retire from the grand jury while that particular matter is being considered. There is no statute which gives a person the right to challenge a grand juror before the indictment is returned, and there is no requirement of law that he shall do so. In fact, one is not a defendant in the Court of General Sessions, according to our practice and custom, until he has been charged by the grand jury in an indictment with the violation of law. As it is well known, in this State a grand jury may indict one for a crime without any previous notice whatever to such individual. A statute might, perhaps, be passed giving one, who has been properly notified that the grand jury will be called upon to examine into an accusation against him, the right to challenge an individual juror before the grand jury considers the indictment, and providing that failure to do so will operate to prevent him from thereafter raising such objection. That is a matter for the consideration of the law-making body; it is not one for this Court.

The exception referred to in the quotation from Corpus Juris, to the effect that the disqualification of one grand juror has no effect on an indictment, unless the grand jury was composed of only twelve men, was made upon the authority of only one decision, and that was *State v. Bazen,* which we have already considered, and which, as we have attempted to show, was incorrectly decided on that particular point, because of the misconception of the language in *State v. Rafe.*

The language and provisions of a state constitution are to be understood and construed with reference to the principles of the common law. When a declaration of a constitution directly conflicts with a rule of the common law, then, of course, the common law rule is revoked. When there is no conflict between the two, the constitution is presumed to intend to preserve the rules, rights, remedies, and principles of the common law. Cooley's Con-

stitutional Limitations (7th Ed.), 94; *Mauldin v. City of Greenville*, 42 S. C., 293, 20 S. E., 842, 27 L. R. A., 284, 46 Am. St. Rep., 723. The cases decided prior to the Constitution of 1895 by our Court of last resort, and the other authorities which we have cited, show conclusively, in our opinion, that the common-law rule was that no one could serve on a grand jury over the protest of an accused person, without possessing at the time the legal qualifications. The Constitution of 1895 has not only recognized that principle of the common law, but it has prescribed the legal qualifications of jurors. At the same time, while recognizing the common-law rule that twelve legal grand jurors are sufficient to return an indictment, it has limited the total number of grand jurors, who may serve on the grand jury, to eighteen, in conflict with the provision of the common law that the number of grand jurors might be as many as twenty-three. Under the construction we think it proper to give the language of our Constitution, according to the principles announced by Judge Cooley, we regard it as being clear that the number of eighteen grand jurors is a maximum, and that it is not necessary for more than twelve of that number to be present to constitute a legal body. The case of *State v. Hall, supra,* confirms our views in this regard. The common-law rule was that the petit jury should consist of twelve men, all of whom must agree to a verdict. Our Constitution has a like provision, and in the *Hall case,* this Court held that it must be construed strictly.

The General Assembly, in the enactment of laws providing for the drawing and summoning of jurors for our Circuit Courts, had in mind the provisions of the Constitution relating to their qualifications, and sought to have those provisions observed. The Act of 1902, now Section 548 of the Code of Civil Procedure 1922, required the jury commissioners, composed of the County Auditor, County Treasurer, and the Clerk of Court of each county, to "prepare a list of such qualified electors, under the provisions of

the Constitution, between the ages of twenty-one and sixty-five years, of good moral character, of their respective counties, as they may deem otherwise well qualified to serve as jurors, being persons of sound judgment and free from all legal exceptions, which list shall include not less than one from every three of such qualified electors under the provisions of the Constitution, between the ages of twenty-one and sixty-five years, and of good moral character. * * *"

By Sections 216 and 217 of Volume 3, Code of 1922, the law being first passed in 1896, immediately following the adoption of the Constitution of 1895, the Clerk of the Court and the magistrates of each county are required to file with the board of registration the names of persons disqualified because of the conviction of crime, as qualified electors, so that the board can take proper steps to prevent the names of such persons from appearing on their books as electors. By Section 220, Ibid, the registration books are to be kept in the office of the Clerk of the Court, one of the jury commissioners, for public inspection; and no doubt it was the purpose of the law that the jury commissioners should examine these books when they proceeded to their duties of filling the jury box, and drawing jurors therefrom, for how, ordinarily, can the jury commissioners know who are qualified electors without examination of the registration books?

While it may be that the right to have qualified grand jurors only to pass upon an indictment is not entirely identical with the right to have a fair and impartial grand jury consider the indictment, we think the two propositions are so closely analogous that decisions regarding the latter have bearing in considering questions relating to the former. In the recent case of *State v. Richardson,* 149 S. C., 121, 146 S. E., 676, 677, Mr. Justice Cothran, speaking for this Court, said: "There can be no doubt as to the proposition that in a criminal prosecution the defendant is entitled to the absolute impartiality of not only the grand jurors who pass upon the indictment, but of the commissioners who are charged with

the duty of drawing them." Supporting this declaration are many cases too numerous to mention. See, however, *State v. Byrd*, 72 S. C., 104, 51 S. E., 542; *State v. Perry*, 73 S. C., 199, 53 S. E., 169; *State v. Malloy*, 91 S. C., 429, 74 S. E., 988; *State v. Hester*, 148 S. C., 360, 146 S. E., 116. If jury commissioners, in the future, should desire to be partial in the important matter of selecting and drawing men for service on juries, how easy this Court could make it for them to do so by sanctioning their disregard of the laws of the State, especially constitutional provisions regarding the qualification of jurors, grand and petit. In *State v. Kilcrease*, 6 S. C., 444, where the Supreme Court held, under the law then existing, that an indictment should be quashed if a witness before the grand jury, upon a bill of indictment, was not sworn in open Court, the opinion concluded with these words:

"If the forms and sanctions which have heretofore been recognized as the bulwarks of the trial by jury are not rigidly adhered to, the constitutional requisition that 'it shall remain inviolate' will fail to accomplish the great objects it was intended to secure. No matter how strong the edifice may be, if the pillars on which it rest one by one are weakened, the great work, consecrated by time, must at last crumble into dust. It is safest to retain it in its pristine form and vigor."

In our system of jurisprudence, there have always been some prerequisites for jury service. They have been, and always will be, necessary for the preservation of jury trial and to safeguard the rights of the people. Without some definitely fixed qualifications for jurors, people who have causes in the Courts, involving not only property, but liberty, and even life, might be put upon the mercy of those charged with the duty of selecting the jurors. We could hardly imagine a more dangerous thing to the rights of free men. The people, through their representatives in constitutional convention and in the Legislature declare, as they should,

The Courts have never sought this power; they cannot exercise it. The Courts may only see, as they should, that the people's laws as to their jurors' qualifications are properly observed.

Our laws as to certain qualifications of jurors, including the one that they must be qualified electors, were made thirty-five years ago by the people in their constitutional convention. They were construed by the Supreme Court of this State thirty-two years ago. *Mew v. Railroad Co., supra.* So far as we are advised, there has not been the slightest effort by the people, or any one of their representatives, to change these laws. The people must be satisfied with them.

Our constitutional provisions at to jurors' qualifications need no defense at our hands. Those who are informed on the subject know full well some of the reasons why the framers of our organic law so wrote those provisions. They desired in the jury boxes, both to accuse and to try, for criminal offenses and for the general duties of grand jurors, so important to the welfare of the State, only men who are residents of the State and county, men who loved the commonwealth, men interested and informed enough to qualify themselves for citizenship, men of character and standing—in short, "The men who make a State"—that those whose lives, liberties and property might be at stake would feel that their causes, if just, would be justly decided. Jury commissioners, if they will observe the laws, plainly laid down for their guidance in the statutes, can prevent in almost every instance the necessity of any Court having to quash an indictment on account of the disqualification of a grand juror, and especially for the disqualification of a juror on the ground that he is not a registered elector, for the registration books, giving information as to who are registered electors, are easily accessible to them. If the commissioners neglect to perform their duties, and one accused of crime demands at the proper time his constitutional right to be indicted only by a legal grand jury, the

Courts will endeavor to give him that right, for all the Judges, like the jury commissioners, have sworn to "preserve, protect and defend the Constitution."

While we hold that the Çircuit Judge committed error in quashing the indictment in this case because of the supposed failure of the instrument to allege the place of the death of the deceased, we conclude that he was correct in his holding that the indictment should be quashed because of the disqualifications of persons, who participated in finding it, to act as grand jurors; and accordingly, the order appealed from is affirmed.

Messrs. Justices Cothran, Stabler and Carter, and Mr. Acting Associate Justice Graydon concur.

Mr. Justice Cothran (concurring): I concur in the opinion of Mr. Justice Blease in this case. In addition to the very clear disposition of the first ground upon which the motion to quash the indictment was made, it may be observed that a common use of the word "then" authorized by Webster is in the sense of "immediately"; if the deceased was shot in Greenville County, and did immediately die, he necessarily died in Greenville County.

As to the second ground, I may add the consideration that one who may be drawn, sworn in, and acts as a grand juror in passing upon an indictment, when he is not legally qualified to do so, is a stranger to the proceedings, as much as if he had never been drawn; his participation would therefore be illegal; it would be impossible to gauge the extent of his influence upon the qualified members of the jury.